**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 19-636** |
| **DESHAUN DAVIS, (1)** | : | |
| **DWAYNE BUTLER, (2)** | | |
| **TYLEEL SCOTT-HARPER, (3)** | : | |
| **ISIAH JENIFER, (6)** | | |
| **FREDERICK ROCHESTER, (7)** | : | |
| **JAMEL COVINGTON, (8)** | | |
| **JOHVON COVINGTON (9)** | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its attorneys, Jennifer Arbittier Williams, Acting United States Attorney for the Eastern District of Pennsylvania, Meaghan A. Flannery and Matthew T. Newcomer, Assistant United States Attorneys for the district, hereby respectfully submits this trial memorandum to assist the Court during the trial scheduled to begin on October 4, 2021.

## I.    THE INDICTMENT

On October 13, 2019, a grand jury in the Eastern District of Pennsylvania returned an indictment charging defendants Deshaun Davis, Dwayne Butler, Tyleel Scott-Harper, Brandon Scott-Harper, Michael Wright, Isiah Jenifer, Frederick Rochester, Jamel Covington, Johvon Covington, Derrick Cooper, Frederick Donaldson, Perley Mack, Jr., and Shahaad Sterling with conspiracy to distribute cocaine base ("crack"), cocaine, fentanyl, and heroin, in violation of 21 U.S.C. § 846 (Count One). As of this writing, defendants Deshaun Davis, Dwayne Butler, Tyleel Scott-Harper, Isiah Jenifer, Frederick Rochester, Jamel Covington, and Johvon Covington are the

1

defendants proceeding to trial.

The defendants were members of a violent street gang referred to as "3rd Bone" that ravaged the city of Chester with a steady supply of crack cocaine over the course of several years. In addition to flooding Chester and the surrounding neighborhoods with dangerous drugs, members of the 3rd Bone gang also terrorized their community with acts of violence, including shootings.[1] For example, on November 14, 2018, law enforcement intercepted a phone call between defendant Davis and defendant Tyleel Scott-Harper in which they spoke about "going hunting" for a rival gang member; hours later, Scott-Harper and other defendants used the 3rd Bone Facebook group chat to encourage the shooting of a rival gang member just minutes before a reported shooting in that area. Less than a week later, defendant Davis was intercepted on his phone overseeing the attempted shooting of another rival gang member (involving defendant Scott-Harper and others), which was fortunately disrupted by law enforcement intervention. The defendants even threatened and assaulted their own drug customers, including an episode in October of 2018 when defendant Butler trashed the home of a delinquent drug customer and threatened to go after the customer's school-aged son.

Defendant Deshaun Davis is also charged with four counts of using a communications facility to facilitate a drug trafficking crime, in violation of 21 U.S.C § 843(b) (Counts 45, 55, 56, 57); and one count of possession of a firearm in furtherance of a drug trafficking

---

[1] The evidence will establish that the defendants were well-armed, often with illegally possessed and stolen firearms. Court-authorized interceptions of Davis' and Butler's phones revealed many discussions of their guns, which they shared amongst themselves. During the course of the conspiracy, a semi-automatic handgun was recovered from defendant Butler's bedroom, defendant Scott-Harper was arrested with drugs and a loaded handgun, and the search of a storage locker rented to defendant Jamel Covington (where he was observed visiting in connection with surveillance of drug sales) revealed a small arsenal of weapons including 10 semi-automatic handguns and a semi-automatic rifle, many of which were reported stolen or were missing serial numbers.

crime, in violation of 18 U.S.C. § 924(c) (Count 60).[2]

Defendant Dwayne Butler is also charged with 31 counts of distributing cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1) (Counts 9, 12, 14, 15, 17, 18, 20-24, 26, 28, 31, 33, 34, 36-39, 42-44, 46-53)[3]; one count of distributing cocaine base ("crack") and heroin, in violation of 21 U.S.C. § 841(a)(1) (Count 16); two counts of distributing cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts 19 and 58); one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count 61); two counts of using a communications facility to facilitate a drug trafficking crime, in violation of 21 U.S.C § 843(b) (Counts 54 and 57); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 62); and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count 63).

Defendant Tyleel Scott-Harper is also charged with one count of distributing cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1) (Count 34);[4] one count of using a communications facility to facilitate a drug trafficking crime, in violation of 21 U.S.C § 843(b) (Count 56); one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count 59); and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 60).[5]

---

[2]    Count 60 also charges defendant Davis with aiding and abetting the possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 2.

[3]    Counts 9, 12, 14, 22, and 34 also charge defendant Butler with aiding and abetting the distribution of cocaine base ("crack"), in violation of 18 U.S.C. § 2.

[4]    Count 34 also charges defendant Tyleel Scott-Harper with aiding and abetting the distribution of cocaine base ("crack"), in violation of 18 U.S.C. § 2.

[5]    Count 60 also charges defendant Tyleel Scott-Harper with aiding and abetting the possession
of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 2.

Defendant Isiah Jenifer is also charged with one count of using a communications facility to facilitate a drug trafficking crime, in violation of 21 U.S.C § 843(b) (Count 45).

Defendant Frederick Rochester is also charged with five counts of distributing cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1) (Counts 5-7, 40, 41).

Defendant Jamel Covington is also charged with one count of using a communications facility to facilitate a drug trafficking crime, in violation of 21 U.S.C § 843(b) (Count 54); one count of possession of cocaine base ("crack"), cocaine, fentanyl, and marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count 66); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 67): and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count 68).

Defendant Johvon Covington is also charged with five counts of distributing cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1) (Counts 8, 9, 10-13)[6].

## II.    ELEMENTS OF THE OFFENSES

### A.  21 U.S.C. § 846 (conspiracy to distribute controlled substances)

To establish a violation of 21 U.S.C. § 846, the government must prove the following elements beyond a reasonable doubt:

1. that two or more people agreed to distribute controlled substances;

2. that the defendant was a party to or member of that agreement;

3. that the defendant joined the agreement or conspiracy knowing of its objective to distribute controlled substances and intending to join together with at least one other alleged

---

[6]    Counts 8, 9, and 12 also charge defendant Johvon Covington with aiding and abetting the distribution of cocaine base ("crack"), in violation of 18 U.S.C. § 2.

conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that objective.

**B.  21 U.S.C. § 841(a)(1) (distribution of controlled substances)**

To establish a violation of 21 U.S.C. § 841(a)(1) (distribution of controlled substances), the government must prove the following elements beyond a reasonable doubt:

1.   that the defendant distributed a mixture or substance containing a controlled substance;

2.   that the defendant distributed the controlled substance knowingly or intentionally;

3.   that the controlled substance was the controlled substance identified in the indictment.

**C. 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances)**

To establish a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), the government must prove the following elements beyond a reasonable doubt:

  1. that the defendant possessed a mixture or substance containing a controlled substance;

  2. that the defendant possessed the controlled substance knowingly or intentionally;

  3. that the defendant intended to distribute the controlled substance;

  4. that the controlled substance was the controlled substance identified in the indictment.

**D. 21 U.S.C. § 843(b) (use of a telephone to facilitate a drug trafficking crime)**

To establish a violation of 21 U.S.C. § 843(b), the government must prove the following elements beyond a reasonable doubt:

  1. that defendant used a telephone to facilitate or cause the commission of a drug trafficking crime;

  2. that the defendant did so knowingly or intentionally.

6

**E.  18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime)**

To establish a violation of 18 U.S.C. § 924(c), the government must prove the following elements beyond a reasonable doubt:

      1.  that the defendant committed a drug trafficking crime;

      2.  that the defendant knowingly possessed a firearm in furtherance of that crime.

**F.  18 U.S.C. § 922(g) (felon in possession of a firearm)**

To establish a violation of 18 U.S.C. § 922(g), the government must prove the following elements beyond a reasonable doubt:

      1.  the defendant was previously convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year;

      2.  that after this conviction, the defendant knowingly possessed a firearm;

      3.  that at the time the defendant possessed the firearm, he knew of the previous conviction and knew that it was for a crime punishable by imprisonment for a term exceeding one year; and

      4.  that the defendant's possession of the firearm or ammunition was in or affecting interstate or foreign commerce.

**G.  18 U.S.C. § 2 (aiding and abetting)**

To establish a violation of 18 U.S.C. § 2, the government must prove the following elements beyond a reasonable doubt:

      1.  that the principal committed the offense charged by committing each of the elements of the offense charged;

2.   that the defendant knew that the offense charged was going to be committed or was being committed by the principal;

3.   that the defendant knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging the principal in committing the specific offense charged and with the intent that the principal commit that specific offense; and

4.   that the defendant performed an act in furtherance of the offense charged.

## III.    FACTUAL BACKGROUND

The charges in this indictment arise from a multi-year joint investigation of the "3rd Bone" Drug Trafficking Organization ("DTO") by the FBI, DEA, and Chester Police Department (CPD). The group operated in the western portion of the city of Chester and was involved in narcotics distribution and several gang-related shootings and homicides. The "3" or "3rd" in the group's name refers to 3rd Street, which is the main east/west thoroughfare that runs through the DTO's territory. The moniker "3BM" is short for "3rd Bone Music" or "3rd Bone Murda" a rap music group that has produced several YouTube music videos, some of which prominently feature the defendants and which contain numerous references to firearms, violence, and narcotics sales.

The portion of Chester known to constitute "3rd Bone" territory is a neighborhood loosely bordered by Tilghman Street to the west, 5th Street to the north, Pusey Street to the east, and 2nd Street (Route 291) to the south. Lamokin Street and Pennell Street are two of the primary streets in the 3rd Bone area. Both intersect with the 1100 block of W. 3rd Street and the 1100 block of Union Street. Graffiti with the "3rd Bone" and "3BM" moniker can be found throughout this area. All the defendants hail from this area. Third Bone members, including the defendants, also frequently identify themselves (including in photographs posted to social media accounts)

using a 3rd Bone hand sign, in which the thumb and index finger are folded inward and the last three fingers are raised, and by wearing clothing bearing the "3BM" moniker as well. Agents have recovered large numbers of social media posts and photographs by the defendants flashing 3rd Bone signs and referencing the group. Some of the defendants also sport tattoos touting their affiliation with the group.

Over the course of a roughly two-year period at the start of this investigation, the FBI and DEA conducted over 50 controlled purchases of crack cocaine, cocaine, and heroin using confidential sources (CS) in 3rd Bone territory, primarily in the area of Lamokin Street, Union Street (also known as the "alleyway"), and the 1100 block of 3rd Street. The vast majority of these controlled purchases were audio/video recorded. The investigation eventually expanded to include multiple wiretaps, extensive human and electronic surveillance, and the execution of search warrants, whereby FBI and DEA gathered substantial evidence of the defendants' drug trafficking activity and defendant Deshaun Davis's role as a senior leader and source of supply to the 3rd Bone DTO.

During the initial period of surveillance and controlled drug purchases, FBI and DEA identified defendant Dwayne Butler as a person of particular interest to the investigation. Butler held a mid-level role within the DTO, in that he sold drugs directly to certain users but also appeared to direct other street-level dealers who were regularly hanging out in the Union Street "alleyway" making hand-to-hand crack cocaine sales. During 2017 and 2018, investigators made over 30 controlled drug purchases directly from Butler using confidential sources. Most of these transactions were set up by having a CS make consensually monitored calls or texts to Butler's cell phone (TARGET TELEPHONE 1). That phone would later be the first of several telephones

subject to court-authorized T-III interception. Over the course of the investigation, FBI/DEA learned that TARGET TELEPHONE 1 was Butler's "trap phone," i.e., the phone that he used to communicate primarily with drug customers and the phone that drug users called to buy narcotics. Butler was briefly incarcerated on local drug charges in October 2017, prior to the initial wiretaps on the case. In a recorded jail call, Butler instructed his girlfriend to provide TARGET TELEPHONE 1 to "Ladder," a nickname for Tyleel Scott-Harper, so he could "make money off of them jawnts." Investigators also learned that Butler used a second phone (TARGET TELEPHONE 2) to speak with other 3rd Bone Members, including Scott-Harper, Davis, and other members.

On September 19, 2018, investigators received court authorization to intercept TARGET TELEPHONES 1 and 2. Almost immediately, these interceptions confirmed that Butler was involved in drug trafficking and was primarily supplied by Davis. Interception of Butler's lines continued until November 17, 2018.

On November 5, 2018, investigators received court authorization to intercept Davis's cell phone (TARGET TELEPHONE 3). Interception of that line confirmed that Davis was responsible for supplying Butler and other 3rd Bone members. For example, in one intercepted call discussing his leadership role with defendant Brandon Scott-Harper, Davis memorably called himself "the top dog" in the 3rd Bone DTO and the one "pushing all these buttons." Interception of Davis's phone continued until January 3, 2019.

In addition to coordinating drug sales and activities, the intercepted calls revealed that the defendants regularly warned one another about the presence of law enforcement and/or rival gang members in 3rd Bone territory, as well as shared firearms and planned violence against rival gang members.

The interceptions were also supported by the execution of several car stops and search warrants of DTO members and customers that resulted in drug recoveries and other valuable evidence. Among other things, search warrants executed for DTO members' social media accounts and seized cell phones revealed a number of conversations among the defendants relating to drug trafficking and gang violence. In particular, a number of the defendants participated in a Facebook group chat to warn fellow DTO members about the presence of police or rivals in the target area. Surveillance and searches confirmed that DTO members were particularly law enforcement conscious and regularly used police scanners and lookouts to monitor police activity in the target area. A number of firearms and quantities of crack cocaine were also recovered during the execution of search warrants. A search warrant executed at Butler's residence resulted in the recovery of a firearm and a quantity of crack cocaine. Tyleel Scott-Harper was also arrested on local charges during the investigation and found to be in possession of a firearm and crack cocaine.[7]  The search of a storage locker rented in the name of defendant Jamel Covington – who, like Davis, was a source for supplying bulk amounts of drugs to the DTO – uncovered a small arsenal of weapons including ten different semi-automatic handguns and one semi-automatic rifle (at least three of them reported stolen, and some with obliterated serial numbers) along with bulk amounts of crack, fentanyl, cocaine, and marijuana.

In sum, the evidence as presented at trial will come in two main parts. The pre-wiretap controlled buys and surveillance from in or about May of 2016 through August of 2018 will establish that individual defendants were engaged in significant crack cocaine trafficking

---

[7] On April 22, 2019, Tyleel Scott-Harper pleaded guilty to possession with intent to deliver, possession of a firearm without a license, and endangering the welfare of a child.

activity in the same high-crime area (namely, the territory around Lamokin, 3rd, and Union Streets) controlled by the 3rd Bone DTO. In furtherance of the conspiracy, the evidence will show the defendants working together to coordinate drug sales, at times sharing Butler's drug phone while Butler was incarcerated.

The second main part will generally cover the wiretap interceptions over TARGET TELEPHONES 1 and 2 (Butler) and 3 (Davis), which occurred from September of 2018 through January of 2019. The wiretap interceptions, surveillance, and social media evidence from this time period will further establish the existence of the conspiracy by showing that each of the defendants: (1) coordinated drug sales with one another; (2) jealously guarded their territory against incursion by rival gang members and traffickers (including by using violence); (3) shared information and warnings about law enforcement activity in the area; and (4) were supplied with drugs by senior DTO member Davis (and to a lesser extent, defendant Jamel Covington). As set forth above, the evidence will also show that Davis directed the activities of other defendants with regard to acts of violence including shootings and attempted shootings of rival gang members. The evidence will further establish that the DTO terrorized the greater Chester community through the use and possession of firearms, through shootings, and through threats and assaults on their own drug customers.

Through analysis of the type and quantity of drugs sold during the period of interception, the government will establish that the total quantity of crack cocaine distributed by the DTO during the conspiracy far exceeds 280 grams of crack cocaine, with the documented activities of Davis alone exceeding that amount. The evidence will establish that Davis and Butler both distributed or possessed with the intent to distribute more than 280 grams of crack and that

12

defendants Tyleel Scott-Harper and Jamel Covington each distributed or possessed with the intent to distribute more than 28 grams of crack.

IV.     **WITNESSES AND EVIDENCE**

    A.     **The Government May Call the Following Witnesses in its Case-in-Chief**:

        1.     Law Enforcement Officers

Among the law enforcement officers expected to testify at trial are:

- FBI SA Joe Milligan

- FBI SA Robert Lockhart

- DEA SA Ethan Rog

- DEA SA Patrick Barry

- FBI TFO John Benozich

- FBI TFO Tim Garron

- Pennsylvania State Trooper Galen Clemons

- Chester Police Officer Leon A. Paparo

- Chester Police Officer Bradley Waltman

- Chester Police Officer Jason Black

- Chester Police Officer Marc Barag

- Chester Police Officer Terrance Taylor

- Chester Police Officer William Swanson

- Chester Police Officer Sean Mullen

- Marcus Hook PD Detective Douglas Staffelbach

- Marcus Hook PD Officer James Dalrymple

- Upland Borough PD Officer Joshua Vanhorn.

- Upland Borough PD Lieutenant Michael Curran

These agents and officers surveilled the transactions described above and will testify to their observations of the activities described above.

    2.   <u>Expert Witnesses</u>

- **<u>DEA SA Eugene Giallombardo</u>** will testify as an expert in methods of drug traffickers and drug trafficking organizations, and will also opine that four defendants – Davis, Butler, Tyleel Scott-Harper, and Jamel Covington – specifically possessed firearms in furtherance of the charged drug trafficking offenses (as charged in the indictment);

- **<u>Lou Grandizio, Firearms Examiner, Delaware County DA's Office</u>**, will provide expert testimony on interstate nexus concerning seized firearms that will be introduced at trial, as well as on operability of the seized firearms.

- Forensic chemists from the Drug Enforcement Administration's Mid-Atlantic Laboratory (in the absence of a stipulation):

        o   Trent B. Caswell

        o   Yvette Johnson

        o   Brittany D. Pasierb

        o   Bryan L. Geer

        o   Danielle L. LaVictoire

        o   Joseph S. Dembowski

14

- o   Rajaa Mesfioui

- o   Joseph Ibrahim

- o   Jonathon K. Liu

- o   Lauren E. Munoz

- o   Mark Frisch

- o   Michelle Curry

- o   Lauren A. Dillon

- o   Ross C. Gordon

- o   Brian Makela

- o   Logan P. Jamison

- Forensic chemists from the Pennsylvania State Police Bureau of Forensic Services, Harrisburg Regional Laboratory

- o   Lauren Force

- o   Irina B. Aleshkevich

- o   Brandy L. Bevan

- o   Christina M. Fialkowski

- o   Adam Shober

3.   <u>Civilian Witnesses</u>:   Due to safety and security concerns, including the threats and acts of violence directed at civilian drug customers during the course of the investigation, the government has not included the names of several other potential witnesses, including those of civilian witnesses. If the government decides to call these witnesses, the government will provide the

15

names of these witnesses to the defendant and to the Court at a reasonable time before their testimony. The government requests the right to call additional witnesses other than those described here that may come to the attention of the government before or during trial.

4.  Custodian Witness

    a.  Facebook records custodian

    b.  Bureau of Prison Records Custodian

**B.  Recordings**

The government will introduce four types of audio and video recordings at trial:

1.  While conducting controlled drug purchase transactions from defendants in this matter, investigators utilized hidden audio and video recording equipment to capture and record the defendants and their coconspirators in the act of supplying drugs. At times, agents also utilized mounted cameras and other video surveillance to observe and record the defendants' activities before, during, and after these drug transactions.

2.  Agents conducted physical and electronic surveillance of the defendants and utilized video recording equipment (including remotely-operated cameras mounted in the relevant areas) to record the defendants' drug trafficking and other activities.

3.  Court-authorized wiretaps of certain cellular telephones utilized by certain of the defendants); and

4.  Audio recordings of calls made by certain of the defendants over recorded lines when these defendants were in local or federal custody.

At the time the audio recordings are played aloud, the Government will move to

16

publish transcripts of the conversations to the jury. Copies of these transcripts will be produced to the defendants before trial; indeed, preliminary line sheet transcripts for the wiretap interceptions have already been provided in discovery.

C.     **Physical Evidence**

At trial, the government will introduce the following physical evidence:

1.     purchased controlled substances;

2.     items recovered during the execution of various search warrants, including controlled substances and firearms; and

3.     photographs taken by law enforcement.

D.     **Summary Charts**

The government intends to use summary charts of phone call evidence to streamline the presentation of evidence and to assist the jury in examination of the evidence that will be introduced at trial.   Under Federal Rule of Evidence 1006, summary charts are admissible if they are based upon evidence that is: (i) voluminous, (ii) admissible and (iii) available to the opponent. *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990).   Although much of the evidence underlying the government's summary charts will, in fact, be offered for admission, it is not necessary that all of the evidence depicted in the charts be admitted as long as it is otherwise admissible.   "It is well established that summary evidence is admissible under Rule 1006 only if the underlying materials upon which the summary is based are admissible."   *United States v. Hevener*, 382 F. Supp. 2d 719, 729 (E.D. Pa 2005) (citing *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992)).

The government may also rely upon charts or summaries as educational devices. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985) ("[I]t is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices"). Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." *Id.* In this case, the charts will assist the jury in understanding the telephone contacts and association between the defendants during the time periods charged in the indictment.

### E.  Summary Witnesses

A summary witness may properly testify about, and use a chart to summarize, evidence that has already been admitted. The court and jury are entitled to have a witness "organize and evaluate evidence which is factually complex and fragmentally revealed." *United States v. Shirley*, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence, as it helped jury organize and evaluate evidence; summary charts properly admitted); *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983). A summary witness may rely on the analysis of others where she has sufficient experience to judge another person's work and incorporate as her own the fact of its expertise. The use of other persons in the preparation of summary evidence goes to its weight, not its admissibility. *United States v. Soulard*, 730 F.2d 1292, 1299 (9th Cir. 1984); *see Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.*, 466 F.2d 722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person

18

who assisted in the preparation of the original records or the summaries be brought to the witness

stand").

    The government intends to have FBI Special Agent Robert Lockhart or another

witness testify, among other things, as a summary witness to the wiretap communications between

the defendants and others involved in the case, which is corroborated by pole camera footage and

surveillance.

   **F.**  <u>**Recalling Case Agent to the Witness Stand**</u>

    During the trial, the government will seek leave to recall the FBI case agent to the

witness stand to address different subjects. While it may be possible for the case agent to testify

about several of these topics in a single appearance on the witness stand, such a constraint may not

promote an efficient or clear presentation of the case. Thus, the government will seek to recall the

case agent so that his testimony can be provided in parts, either by subject matter, or

chronologically, as required for a clear and concise presentation of the case.

    This procedure has been endorsed by numerous courts. *See, e.g., United States v.*

*Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (collecting cases that have approved of the practice;

noting that Federal Rule of Evidence 611(a) authorizes the Court to control the order of

interrogation and the presentation of evidence); *United States v. Coleman*, 805 F.2d 474, 482 (3d

Cir. 1986) ("The district court has discretion to allow the recall of a witness, even if the witness

has consulted with the prosecutor in the interim."); *United States v. Butera*, 677 F.2d 1376, 1381

(11th Cir. 1982) (district court had discretion under Rule 611(a) to permit case agent to take the

stand on four separate occasions to describe events in chronological order); *United States v.*

*Rodgers*, 2014 WL 3735585, at \*2 (W.D. Pa. July 28, 2014) (permitting recall of certain law

enforcement witnesses so the government may present its evidence chronologically); *United States v. Dimora*, 843 F. Supp. 2d 799, 822-23 (N.D. Ohio 2012) (approving the recalling of a government witness because it will provide a clear and orderly trial and aid the jury's understanding of the evidence); *United States v. Bacon*, 2012 WL 5381415, at *1 (W.D. Pa. Oct. 31, 2012) (permitting recall of police detective so the government may present its evidence chronologically). The government submits that a similar procedure, if necessary, should be permitted here.

For example, the government intends to call lead case agent Rob Lockhart at the beginning of trial as a summary witness explaining the origin and progression of the investigation from 2016 through 2019, and the various law enforcement techniques used in furtherance of the investigation. Later in the trial, the government intends to recall Agent Lockhart as a fact witness concerning the evidence collected during and in relation to the intercepted wiretap communications and surveillance and other law enforcement techniques utilized during that time period.

### G. Business Records

The government intends to introduce several business records including pen register records for outgoing telephone calls placed by the defendants, as well as Facebook records. The government may also introduce certain public records, including department of motor vehicle records. The government intends to introduce these records as evidence of the charges against the defendants, to establish the relationship and association between and among the defendants, and to corroborate the testimony of government witnesses. Additionally, the government intends to admit

the certified conviction records of defendant Tyleel Scott-Harper in relation to overt acts 106 and 163 to 165 (Counts 59 and 60).

The government has provided and will continue to provide (as they are received) business record certifications for these records pursuant to Rule 902(11). Fed. R. Evid. 902(11). The government intends to introduce these records as evidence of the charges against the defendants, to establish the relationship and association between the defendants, and to corroborate the testimony of government witnesses. The government will file a motion to admit these business records pursuant to Federal Rule of Evidence 902(11) if the parties are unable to reach a stipulation to same.

### H.    **Stipulations**

The government will submit proposed stipulations to the defendants in order to streamline the trial and eliminate the need to call unnecessary witnesses. The government will provide a copy of any stipulations agreed to by the government and the defendants to the Court.

## V.    **LENGTH OF THE TRIAL**

The government estimates that trial in this case should last approximately 3 weeks. The evidence in this case will consist of: testimony of law enforcement and civilian witnesses; expert witnesses; recorded audio and video footage; various documents, reports, and photographs; and physical evidence including narcotics and narcotics paraphernalia, firearms, ammunition, and United States currency. Additionally, the government intends to introduce various business and public records, including social media and telephone records as evidence of the charges against the defendants, and to corroborate the testimony of government witnesses.

## VI.    LEGAL AND EVIDENTIARY ISSUES

### A.    Conspiracy Generally

Where, as here, the indictment charges the existence of a conspiracy containing multiple members, the United States must provide evidence at trial that will allow a reasonable fact finder to conclude beyond a reasonable doubt that the defendant and at least one other person shared a "of purpose" or the intent to "achieve a common goal" and an agreement to "work together toward the goal." *United States v. Applewaite*, 195 F.3d 679, 684 (3d Cir. 1999) (citations omitted). The United States is not required to prove the existence of an express or formal agreement; "a tacit understanding is sufficient." *Ianelli v. United States*, 420 U.S. 770, 777 n.10 (1975). Further, proof of the existence of an agreement may be established entirely by circumstantial evidence. Conspiracy law merely requires that the inferences drawn have a logical and convincing connection to the evidence. *Applewaite*, 195 F.3d at 684. Moreover, "juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence." *United States v. Ramirez*, 954 F.2d 1035, 1039 (5th Cir. 1992). It bears observing that the government, to sustain a conspiracy conviction, need only show sufficient evidence that the defendant conspired with "someone – anyone."   *United States v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001) (*quoting United States v. Obialo*, 23 F.3d 69, 73 (3d Cir. 1994)).

In this case, as charged in Count One of the indictment, the defendants conspired with each other to distribute crack, cocaine, fentanyl, and heroin during a period of approximately three and a half years. The government will prove the existence of the conspiracy and each defendant's role in the conspiracy though a variety of evidence including: witness testimony,

22

recorded phone calls and other recorded conversations including text messages; surveillance of the defendants' narcotics distribution and activities; recoveries of narcotics possessed and sold by defendants; and telephone and social media records.

**B.    Factors Demonstrating Existence of a Conspiracy**

"The elements of a charge of conspiracy are: (1) 'a unity of purpose between the alleged conspirators;' (2) 'an intent to achieve a common goal;' and (3) 'an agreement to work together toward that goal.'" *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). The Court in *Gibbs* noted that "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation.'" *Id*. at 198, *quoting United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994), and citing *United States v. Theodoropoulos*, 866 F.2d 587, 594 (3d Cir. 1989).

The facts that can support the existence of a conspiracy are quite varied.   Some examples are:

- the length of affiliation between the parties, *Gibbs*, 190 F.3d at 199;

- repeated, familiar dealings, which provide an inference that the buyer "comprehends fully the nature of the group with whom he [or she] is dealing, is more likely to depend heavily on the conspiracy as the sole source of his [or her] drugs, and is more likely to perform drug-related acts for conspiracy members in an effort to maintain his [or her] connection to them," *id*.;

- knowledge of buyer that seller sells to people other than himself; knowledge of seller that buyer is re-seller, *Gibbs*, 190 F.3d at 201;

- the buyer purchased large amounts of drugs from seller, *United States v. Pressler*, 256 F.3d 144, 153, n.4 (3d Cir. 2001) (citing *Gibbs*);

- code used in drug transactions, <u>id</u>. (citing *Gibbs*); and

- extensive use of phones between parties involved in drug trafficking, *United States v. Rodriguez*, 215 F.3d 110, 117 (1st Cir. 2000).

"Numerous suppliers and distributors operating under the aegis of a common core group can be treated as a single conspiracy. The government need not prove that each defendant knew all the details, goals, or other participants." *Id*. at 728, citing *Theodoropoulos*, 866 F.2d at 593.

### C.    Association With Other Conspirators

While presence and association alone cannot establish a defendant's participation in a conspiracy, the jury is permitted to "consider presence and association, along with other evidence, in finding conspiratorial activity by the defendant." *United States v. Chavez*, 947 F.2d 742, 745 (5th Cir.1991). *See also United States v. Pompa*, 434 F.3d 800, 806-07 (5th Cir. 2005); accord *United States v. Mickelson*, 378 F.3d 810, 821(8th Cir. 2004) (association, while not enough on its own to prove conspiracy, is admissible with other evidence to prove conspiracy). Photographs of various defendants together is admissible to prove a conspiracy. *United States v. Price*, 418 F.3d 771, 782 (7th Cir. 2005). The government will introduce text messages and audio and video recordings and other evidence of the defendants working together, warning one another of police presence and rival gang members, and passing sales.

### D.    Events Not Specifically Alleged in the Conspiracy

Title 21, United States Code, Section 846 does not require that the government allege or prove an overt act in order to prove a violation of the statute. There are a wide variety of facts adverted to in the superseding indictment; there are also a wide variety of facts that were not alleged in the superseding indictment, but which prove the conspiracy. This additional evidence relates directly to the conspiracy, and is admissible despite the fact that it is not specifically

24

discussed in the indictment. *See United States v. Gibbs*, 190 F.3d 188, 217 (3d Cir. 1999) (holding

that defendant=s participation in uncharged acts of violence was admissible as direct proof of the

conspiracy with which he was charged); *United States v. Thai*, 29 F.3d 785, 812 13 (2d Cir. 1994)

("[i]t is clear the Government may offer proof of acts not included within the indictment, as long

as they are within the scope of the conspiracy . . . An act that is alleged to have been done in

furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b);

rather it is part of the very act charged.") (internal quotations and citations omitted).    In *United*

*States v. Cross*, 308 F.3d 308 (3d Cir. 2002), the Third Circuit explained that "acts are intrinsic

when they directly prove the charged [crime]."

### E.    Admissibility of Co-Conspirator Statements

At trial, the government intends to present co-conspirator statements, principally

through the testimony of law enforcement officers who overheard the telephone calls during which

the CI and the defendants and/or the defendants and their co-conspirators arranged the drug

transactions.    The government will offer this evidence, in part, to establish the existence of a

criminal conspiracy. Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a

co-conspirator of a party during the course and in furtherance of that conspiracy" is not hearsay

and may be admitted as evidence against a co-conspirator. In order for a court to admit the

co-conspirator statement, the government must prove that (1) a conspiracy existed, (2) the

declarant and the defendant were both members of the conspiracy, (3) the statement was made in

the course of the conspiracy; and 4) the statement was made in furtherance of the conspiracy.

*United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. McGlory*, 968 F.2d 309,

333-34 (3d Cir. 1992); *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. *Bourjaily*, 483 U.S. at 180-81. "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id.*; *see also McGlory*, 968 F.2d at 334. The district court should consider the totality of the circumstances when deciding the admissibility of such evidence. "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court. *See* Fed. R. Evid. 801(d)(2) (Advisory Committee Notes); *United States v. Traitz*, 871 F.2d 368, 399 (3d Cir. 1989). When determining the admissibility of a co-conspirator statement, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175.

Although casual conversations between co-conspirators are inadmissible, statements that, among other things, maintain cohesiveness and convey information relevant to conspiratorial objectives are in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E). *Traitz*, 871 F.2d at 399. Accordingly, "statements of a co-conspirator identifying a fellow co-conspirator as his source of narcotics are statements made in furtherance of the conspiracy." *United States v. Lambros*, 564 F.2d 26, 30 (8th Cir. 1977); *see United States v. Munson*, 819 F.2d 337, 341 (1st Cir. 1987); *United States v. Anderson*, 642 F.2d 281, 285 (9th Cir. 1981).

The Third Circuit has commented that the "in furtherance" requirement is to be given a broad interpretation. *United States v. Gibbs*, 739 F.2d 838, 843 (3d Cir. 1984); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1985). Although the "during the course of" and "in furtherance" requirements do not overlap entirely, they are closely related. *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir.1983). While mere narratives of past events or mere idle chatter that has no current purpose are not generally deemed to occur in furtherance of the conspiracy, statements that "provide reassurance, serve to maintain trust and cohesiveness among co-conspirators, or inform each other of the current status of the conspiracy" further the conspiracy. *Id*., at 252; *see United States v. Harris*, 908 F.2d 728, 737 (11th Cir. 1990); *United States v. Hudson*, 970 F.2d 948, 958-59 (1st Cir. 1992). For example, statements which are relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the conspiracy. *Ammar*, 714 F.2d at 253. In order for statements to be deemed "in furtherance of the conspiracy," they need not actually "further" the conspiracy; it is sufficient that a statement was intended to promote the conspiracy, even if it did not actually do so. *See United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990).

The trial court may admit statements pursuant to the Rule even if the statements relate to a conspiracy not charged in the indictment. *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976). The rationale for this rule is that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on the theory "that a person who has authorized another to speak or act to some joint

end will be held responsible for what is later said or done by his agent . . ." *Trowery*, 542 F.2d at 626.

### F.    <u>Testimony of What a Listener Understood a Declarant to Mean</u>

A witness may testify to what he or she understood a declarant to mean with respect to a statement made by the declarant to the witness. *United States v. Brooks*, 473 F.2d 817, 818 (9th Cir. 1973) (per curiam).

### G.    <u>Narcotics Dealing as Evidence of Motive to Possess Firearms</u>

It is settled that evidence of narcotics dealing is admissible to show a defendant's motive for possessing a firearm. *See, e.g., United States v. Jacobs*, 44 F.3d 1219, 1225 (3d Cir. 1995) ("[e]vidence tending to show that the defendant was a participant in the selling of drugs was relevant under Rule 402 and was admissible under Rule 404(b) to show that the defendant had a motive for carrying a firearm"); *United States v. Rankin*, 902 F.2d 1344, 1346 (8th Cir. 1990) ("[e]vidence that [the defendant] possessed cocaine could establish a motive for possessing a weapon"). *United States v. Rivera*, 844 F.2d 916, 926 (5th Cir. 1987) (evidence that defendant is narcotics trafficker is evidence of motive to possess weapons). Thus, in this case, the evidence of the defendants' drug trafficking activity is relevant to and supports the allegations of gun use and possession by the defendants as part of the manner and means of the charged conspiracy.

### H.    <u>Possession of Firearms as Evidence of Intent to Distribute Narcotics</u>

Guns are an acknowledged "tool of the trade" in the drug business. Possession of weapons, in particular handguns, along with other evidence, is powerful circumstantial evidence that an individual is in the drug trafficking trade. *United States v. Price*, 418 F.3d 771, 779 (7th

28

Cir. 2005); *United States v. Adams*, 759 F.2d 1099, 1108 (3d Cir. 1983) (admission of Uzi type weapons during narcotics trial not unduly prejudicial; guns are "tools of the trade"). In this case, evidence of the numerous firearms and ammunition used and recovered is admissible to prove the charges against the defendants.

**I.**   **Drug Sales Involving Only One Defendant**

Drug sales conducted during the course of a conspiracy, even when they did not involve all defendants, are admissible against all defendants to prove the nature and extent of the conspiracy, because each conspirator is liable for the acts of his co-conspirators, undertaken during and in furtherance of the conspiracy, even when he was not aware of the actions of his co-conspirators. *United States v. Johnston*, 353 F.3d 617, 624 (8th Cir. 2003).

**J.**   **Constructive Possession**

Possession of drugs or firearms need not be actual or exclusive. "[O]wnership, dominion, or control over the contraband itself, or dominion or control over the premises in which the contraband is concealed. . ." amounts to "constructive possession." *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991) (possession of firearms in house defendant co-occupied; defendant not present when guns seized) (citations omitted).

> Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, . . . and[it] may be proved by direct or circumstantial evidence. It is not necessary that such evidence remove every reasonable hypothesis except that of guilt.

*United States v. Rivera*, 844 F.2d 916, 925 (2d Cir. 1987) (possession of firearms in house defendant co-occupied) (citations omitted). "It is not necessary that the exercise of dominion and control by others be disproved; it is only necessary that the evidence support the jury's finding

that [defendant] exercised dominion and control over the weapon." *Id*. at 926. *See also United States v. DePugh*, 993 F.2d 1362, 1364 (8th Cir. 1993) (gun found in residence; defendant not present).

Similarly, narcotics may be constructively possessed by one exercising dominion and control over a house. *United States v. Wilson*, 107 F.3d 774, 779 (10th Cir. 1997) (no direct evidence that defendant owned or rented premises; letters, documents and photographs of defendant found in upstairs bedroom; drugs found in yard). Dominion and control can be inferred from use of a property, *see Jackson v. Byrd*, 105 F.3d 145, 150 (3d Cir. 1996).

### K.    Drug Trafficking Expert Testimony

"In cases involving narcotics trafficking, courts have admitted a broad range of expert testimony concerning the 'modus operandi' of the drug trade."[8] *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992); *see also United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) ("[E]xpert testimony concerning the modus operandi of individuals involved in drug trafficking does not violate Rule 704(b)"). It is well established that police officers may testify as experts concerning the methods and practices employed in a particular area of criminal activity, *United States v. Pungitore*, 910 F.2d 1084, 1149 (3d Cir. 1990), including the operations of a

---

[8]    More generally, if specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question. Fed. R. Evid. 702. An expert's opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field. Fed. R. Evid. 703. An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704. The court has broad discretion to determine whether to admit expert testimony. *United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999).

drug trafficking ring, *United States v. Ginsberg*, 758 F.2d 823, 830 (2d Cir. 1985); *United States v. Montas*, 41 F.3d 775, 783-84 (1st Cir. 1994). Courts have upheld the admissibility of expert testimony by investigative agents who are properly qualified as experts regarding the "tools of the trade" for narcotics trafficking. *United States v. Foster*, 939 F.2d 445, 453 (7th Cir. 1991); *United States v. Solis*, 923 F.2d 548, 550-51 (7th Cir. 1991) (expert testimony upheld on the use of beepers in narcotics trafficking); *United States v. Monu*, 782 F.2d 1209, 1210-11 (4th Cir. 1986) (expert testimony upheld on the use of scales in the drug trade); *United States v. Navarro*, 90 F.3d 1245, 1259-60 (7th Cir. 1996). In addition, "experienced narcotics agent[s] may testify about the significance of certain conduct or methods of operation to the drug distribution business, as such testimony is often helpful in assisting the trier of fact understand the evidence." *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997), quoting *United States v. Washington*, 44 F.3d 1271, 1283 (5th Cir. 1995).

In this case, the government intends to introduce the testimony of an expert in narcotics. This expert will explain the significance of the circumstances surrounding the recovery of narcotics and the firearms in this case (specifically its possession in furtherance of a drug trafficking offense); and will further explain that the circumstances surrounding the recovery of the narcotics and firearms are consistent with drug distribution. A narcotics expert will also explain the use of coded language in arranging for narcotics distribution, and the measures taken to avoid law enforcement detection of street sales of narcotics. This expert testimony concerning various aspects of drugs and drug trafficking, which is shaped through years of experience, is specialized knowledge, which is not within the purview of the average juror. We expect the

expert to testify that drug traffickers often carry firearms to protect themselves, their drugs, and their drugs proceeds while engaging in the narcotics trade.

### L.    **Other Expert Testimony**

The government also intends to introduce the testimony of a firearms expert to speak to the origin and operability of the firearms recovered during the course of this investigation. It will also call, if necessary, the chemists who analyzed the narcotics purchased during the controlled buys, seized in the execution of search warrants, and recovered by the local police in this case.

The government will comply with its Rule 16 disclosure obligations as directed by the Court in its scheduling order. The government reserves the right to supplement its witness list as may be required, including with additional witnesses necessary to establish chain of custody. The government also reserves the right to call rebuttal witnesses in the event the defendants elect to present any defense.

### M.    **Duplicates**

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) under the circumstances, it would be unfair to admit the duplicate instead of the original. Fed. R. Evid. 1003.

### N.    **Authentication and Chain of Custody**

"The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010) (quoting Fed. R. Evid. 901). "To establish a chain of custody sufficient to make evidence admissible, the proponent 'need only prove a rational basis

from which to conclude' that the evidence is what the party claims it to be." *Rawlins*, 606 F.3d at 82 (quoting *United States v. Mendel*, 746 F.2d 155, 166 (2d Cir. 1984)). The government has sought a stipulation as to the chain of custody of its trial exhibits.

### O.    Exhibits – Presented in Electronic Format

The government will provide defense counsel and the Court with exhibit discs prior to trial. In addition, in order to move quickly and save significant time in presenting evidence the government will have the exhibits loaded into a computer to allow for their display electronically to the jury.

### P.    Use of Agents' Notes and Reports to Cross-Examine Witnesses

The government has provided the defense with reports of witness interviews by government agents. To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents. However, under the Federal Rules of Evidence, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports or notes. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants who were being tried. *Id*. at 28. One defendant sought to impeach the agent by admitting interview notes taken by an Assistant U.S. Attorney who had interviewed the agent as a prior inconsistent statement. *Id*. at 28-29. The district court rejected the effort and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant as an impeaching prior inconsistent statement and consequently inadmissible:

33

We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization. … Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

*Id*. at 29 (citation omitted).

As a matter of evidence, the burden "of proving that notes reflect the witness's own words rather than the note-taker's characterization falls on the party seeking to introduce the notes." *Id*. Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by witness or represents the verbatim transcript of the witness' statement. *See id*. at 30. In the absence of such proof, cross-examination from such reports or notes should be carefully scrutinized so that a statement that is otherwise inadmissible is not back-doored into evidence and read into the record. *See also United States v. Shoenborn*, 4 F.3d 1424, 1427-28 and n.3 (7th Cir. 1993). In this case, defendants should not be permitted to admit notes or reports to impeach the underlying subjects of those interviews, or cross-examine witnesses using any portion of the statement.

## Q.    <u>Punishment is Irrelevant</u>

The punishment for the offense charged is not a proper matter for the jury's consideration. *See Shannon v. United States*, 513 U.S. 573 (1994); *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993); *United States v. Austin*, 533 F.2d 879, 885-86 & n.14 (3d Cir. 1976); *See generally* 1 L.Sand, J.Siffert, W. Loughlin, and S. Reiss, *Modern Federal Jury Instructions -- Criminal* ¶ 9.01 (1993). As the court observed in *United States v. Greer*, 620 F.2d

34

1383, 1384 (10th Cir. 1980): "The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial." Questioning and argument addressing these issues, thus, would be improper. Evidence should be excluded where it is irrelevant to the issue being tried or where it will "induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented...." *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986) (citation omitted).

## R.    Bifurcation of the 18 U.S.C. § 922(g) Count

Counts 68 and 63 charge the defendants Dwayne Butler and Jamel Covington, respectively, with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). The government requests that these counts, in their entirety, be bifurcated from the rest of the proceeding. *See United States v. Joshua*, 976 F.2d 844, 848 (3d Cir. 1992). *See United States v. Joshua*, 976 F.2d 844, 848 (3d Cir. 1992) (approving the bifurcated trial of a felon-in-possession count where the defendant was charged with armed bank robbery and related firearms offenses); *United States v. Busic*, 587 F.2d 577, 585 (3d Cir. 1978) (same in dictum).[9]

---

[9]    The Third Circuit Model Jury Instructions provide the following reasoning to support bifurcation of a §922(g) charge:

Because of this risk of prejudice, defendants generally request bifurcation of the issues to reduce the prejudicial impact of the prior conviction, seeking to have evidence of the prior conviction withheld until the jury has resolved the other issues in the case . . . if the felon in possession charge under § 922(g) is joined with other charges, the court should strongly consider bifurcating the trial . . . If the defense does not request bifurcation, the judge may want to colloquy the defendant and defense counsel to establish on the record that they do not desire bifurcation.

Third Circuit Model Criminal Jury Instruction, No. 6.18 (2017).

35

If the Court uses its discretion to bifurcate this matter, the government will not introduce evidence of the defendant's prior conviction, either through stipulation or certified copy, until after the jury has reached a verdict on Counts One and Two. Likewise, the government will not introduce evidence regarding the interstate origins of the firearms until after the jury has reached a verdict on Counts One and Two. The Third Circuit Model Jury Instructions state that the following instruction should be provided to jury before they are sent to deliberate on the first two counts:

> Please be aware that, after you complete your deliberations, there may be some additional evidence presented and an additional matter about which you will have to deliberate.

Third Circuit Model Criminal Jury Instruction, No. 6.18 (2017).

## S.    Forfeiture Procedures

In addition to the counts of the indictment detailed above, the indictment gives notice of forfeiture, and seeks the forfeiture of, among other things, any property used to commit the charged offenses, including a variety of vehicles and proceeds of the charged criminal activity.   If the forfeiture is contested, the court must conduct a separate forfeiture proceeding pursuant to Fed. R. Crim. P. 32.2(b)(1) "as soon as practical after a verdict of guilty or the entry of a guilty plea."   Under the current version of Rule 32.2(b)(5), if the case is tried to a jury, either party may request that the jury be retained to determine forfeiture, but the request must be made before the jury begins deliberating guilt or innocence. This is a major change, intended to protect the Government from having to waste its time preparing witnesses, jury instructions, and special verdict forms while the jury is deliberating, only to have the defendant announce that he is waiving the jury once they come back with a guilty verdict (as defendants almost always do).

36

The Government believes that before the Court instructs the jury, it should inquire of the defendants whether they will be asking that the jury be retained to consider the forfeiture in the event of a conviction. The evidence in support of the forfeiture can be presented in part by pointing to evidence already in the record. To the extent that the government must present additional evidence to meet its burden at the forfeiture stage, the government may call additional witnesses. If the jury is waived, the court still must determine the forfeiture "as soon as practicable," but it need not do so immediately after the jury is excused.

**T.     Drug Weight Reasonably Foreseeable as to Each Defendant**

Defendants Davis and Butler are charged in Count One with conspiring to distribute 280 grams or more of a mixture and substance containing cocaine base, and defendants Tyleel-Scott Harper and Jamel Covington are charged with conspiring to distribute 28 grams or more of a mixture and substance containing cocaine base. Each defendant is responsible for the drugs he actually possessed, and distributed by defendant, as well as all the drugs co-conspirators possessed with the intent to distribute which were foreseeable to the defendant. In addition to the seized narcotics and customer testimony regarding the volume of narcotics sold by the DTO, the government intends to offer a drug quantity summary through a law enforcement witness, who will   summarize his review of the pertinent, recorded TIII intercepts of Butler's drug phone (TARGET TELEPHONE 2), and the average amount of crack sold during the approximately two months of the wiretap on that phone. The agent will then apply those averages to each defendant's time in the conspiracy, as corroborated by other evidence including the defendants' pen register activity, to arrive at a foreseeable drug weight as to each individual defendant.

37

### U.      Consciousness of Guilt

Pursuant to the government's proposed jury instructions, filed under separate cover, the government is requesting a consciousness of guilt instruction in this case. The evidence at trial will show that defendant Tyleel Scott-Harper fled from law enforcement during the course of the charged conspiracy. Such evidence of flight is evidence of consciousness of guilt, and is admissible against the actor. *See United States v. Green*, 25 F.3d 206, 210 (3rd Cir. 1994) (flight by defendant after seeing police officer who defendant knew was aware of defendant's open warrants); *United States v. Hernandez-Miranda*, 601 F.2d 1104, 1106 (9th Cir. 1979) (failure to appear permits inference of consciousness of guilt; fact defendant can offer alternate explanation does not warrant suppression); *United States v. Ritch*, 583 F.2d 1179, 1181 (1st Cir. 1978) (failure to appear admissible in trial of underlying narcotics case as evidence of consciousness of guilt); *United States v. Martinez*, 944 F. Supp. 975, 981 (S.D.N.Y. 1994) (failure to appear, without flight from jurisdiction, evidence of consciousness of guilt).

### V.      Enhanced Sentencing Under the First Step Act

In accordance with current Department of Justice guidance concerning the recently enacted "First Step Act," the second superseding indictment charges in Count One that defendant Davis has a prior serious drug felony for which he was convicted and served more than 12 months of imprisonment and for which he was released from imprisonment within 15 years of the commencement of his involvement in the instant offense. If Davis is convicted of Count One, the government will then present evidence in a bifurcated proceeding (absent stipulations) that he was previously convicted, as set forth above, served more than 12 months imprisonment, and was released within 15 years of the commencement of his involvement in the

charged conspiracy. The government will submit specialized jury instructions for this bifurcated

proceeding and a special verdict form asking the jury to find the above facts.

## VI.    **<u>CONCLUSION</u>**

The government respectfully requests leave to file such other and supplemental

memoranda as necessary during the course of the trial.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
*Acting United States Attorney*


*/s Jerome M. Maiatico*
JEROME M. MAIATICO
*Assistant United States Attorney*
*Chief, Narcotics and Organized Crime*

*/s Meaghan A. Flannery*
MEAGHAN A. FLANNERY
MATTHEW T. NEWCOMER
*Assistant United States Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the within Government's Trial Memorandum has been served by me this date, by email or electronic filing upon the following people:

Nino Tinari, Esquire
nino@ntinarilaw.com
*Counsel for Deshaun Davis*

Steve Edward Jarmon, Esquire
sjarmon@lambmcerlane.com
*Counsel for Dwayne Butler*

Andrew Montroy, Esquire
amontroy@gmail.com
*Counsel for Tyleel Scott-Harper*

Rhonda Pantellas Lowe, Esquire
rhonda@rhondaplowe.com
*Counsel for Isiah Jenifer*

Benjamin Booper, Esquire
bcooperlawyer@gmail.com
*Counsel for Frederick Rochester*

Paul J. Hetznecker, Esquire
phetznecker@aol.com
*Counsel for Jamel Covington*

Michael N. Huff, Esquire
michael.huff.esq@gmail.com
*Counsel for Johvon Covington*

*/s Meaghan A. Flannery*
MEAGHAN A. FLANNERY
MATTHEW T. NEWCOMER
Assistant United States Attorneys

Date: August 16, 2021

40